## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| I.M., by and through his Parents and next friends, C.C. and M.M., | ) ) ) |
| Plaintiffs, | ) ) | CIVIL ACTION NO. 11-cv- |
| v. | ) ) ) |
| NORTHAMPTON PUBLIC SCHOOLS and the COMMONWEALTH OF MASSACHUSETTS, DIVISION OF ADMINISTRATIVE LAW APPEALS, BUREAU OF SPECIAL EDUCATION APPEALS | ) ) ) ) ) ) ) ) | **COMPLAINT** |

I.M., by and through his Parents and next
friends, C.C. and M.M.,
                                    Plaintiffs,

CIVIL ACTION NO.
11-cv-

            v.

NORTHAMPTON PUBLIC SCHOOLS and
the COMMONWEALTH OF
MASSACHUSETTS, DIVISION OF
ADMINISTRATIVE LAW APPEALS,
BUREAU OF SPECIAL EDUCATION
APPEALS

**COMPLAINT**

### I.      INTRODUCTION

1.      I.M.[1] brings this action, by and through his parents and next friends ("Parents"), seeking review of a decision rendered by the Commonwealth of Massachusetts, Division of Administrative Law Appeals, Bureau of Special Education Appeals ("BSEA"). That decision, dated June 3, 2011, is referred to herein as *BSEA Op.* and attached as Exhibit 1. I.M. and his Parents also assert related statutory claims against the Northampton Public Schools ("NPS" or "Northampton").

### II.     JURISDICTION AND VENUE

2.      This Court has jurisdiction of the case pursuant to 28 U.S.C. § 1331 and 20 U.S.C. § 1415(i)(3)(A). Venue is proper in this district pursuant to 28 U.S.C. § 1391(b).

### III.    PARTIES

3.      Plaintiff I.M. is a now ten-year-old student with disabilities who lives with his Parents within the area served by NPS. I.M. is a "child with a disability" within the meaning of the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1402(3)(A), 34 C.F.R. § 300.8, and a "qualified individual with a disability" within the meaning of § 504 of the Rehabilitation Act ("Section 504" or "Rehabilitation Act"), 29 U.S.C. § 705(20) and Title II of the Americans with Disabilities Act, 42 U.S.C. § 12131(2), 28 C.F.R. § 35.104.

---

[1] Pursuant to Local Rule 5.3, this Complaint includes redacted names for the minor student and his Parents.

Parents bring this action on their own behalf and on behalf of I.M.

      4.      C.C. and M.M. have a "legally cognizable interest in [I.M.'s] education. . . . Congress has found that 'the education of children with disabilities can be made more effective by . . . strengthening the role and responsibility of parents and ensuring that families of such children have meaningful opportunities to participate in the education of their children at school and at home.'" *Winkelman v. Parma City Sch. Dist.*, 550 U.S. 516, 534 (2007) (citing 20 U.S.C. § 1400(c)(5)).

      5.      Defendant NPS is a local educational agency ("LEA") within the meaning of 20 U.S.C. § 1401(15), 34 CFR § 300.28, a federal funds recipient within the meaning of IDEA, 20 U.S.C. § 1401 and Section 504, 29 U.S.C. § 794(b)(2)(B), and a public entity as defined in the ADA, 42 U.S.C. § 12131(1), 28 C.F.R. § 35.104

      6.      Defendant BSEA is responsible for holding due process hearings pursuant to the requirements of 20 U.S.C. §1415 *et seq.*

## IV.    STATUTORY BACKGROUND

      7.      Because he is eligible for special education and related services, I.M. is entitled to a free appropriate public education ("FAPE") delivered pursuant to an Individualized Education Program ("IEP"). An IEP is a written document that provides, among other things, a student's current educational level, the short-term and long-term goals of the educational plan, the specific services to be offered and a set of objective criteria for subsequent evaluation. 20 U.S.C. § 1401(20); 20 U.S.C. § 1414(d)(1)(A).

      8.      A student's right to FAPE is assured through the development and implementation of an IEP. The IEP must be custom tailored to meet the "unique" needs of the particular special education student so that the student will receive sufficient educational benefit. *Honig v. Doe,* 484 U.S. 305, 311-12 (1988); *Board of Educ. of the Hendrick Hudson Central Sch. Dist. v. Rowley*, 458 U.S. 176, 182 (1982).

      9.      FAPE also entails complying with the procedural requirements of the IDEA. A school district that violates a student's procedural rights under federal or state law may be liable where "procedural inadequacies [have] compromised the pupil's right to an appropriate education...or caused a deprivation of educational benefits." *Roland M. v. Concord Public Schools*, 910 F.2d 983, 994 (1st Cir. 1990); *see also Murphy v. Timberlane Regional Sch. Dist.*, 22 F.3d 1196 (1st Cir. 1994).

      10.    IDEA requires delivery of services delineated in an IEP in the "least restrictive environment" which requires that "[t]o the maximum extent appropriate,

children with disabilities . . . are educated with children who are nondisabled." 20 U.S.C. §1400(d)(1)(A); 20 U.S.C. §1412(a)(1)(A); 20 U.S.C. §1412(a)(5)(A).

11.     In reviewing a state administrative agency's decision under IDEA, federal courts must conduct an independent review which accords "due weight" to the administrative proceedings. The judicial function at this level is one of "involved oversight." "Conclusions of law are subject to de novo review, and any determinations on mixed questions of fact and law, including the sufficiency of an IEP, cannot stand if predicated on a legal error." *Dracut Sch. Comm. v. Bureau of Special Educ. Appeals of the Mass. Dep't of Elem. & Secondary Educ.*, 737 F. Supp. 2d 35, 49 (D. Mass. 2010) (quoting *Ross v. Framingham Sch. Comm.*, 44 F. Supp. 2d 104, 111-12 (D. Mass. 1999), aff'd, 229 F.3d 1133 (1st Cir. 2000)).

## V.     FACTS

12.     I.M. has dystonic quadriplegic cerebral palsy and cortical vision impairment. He has received specialized medical and educational supports from an early age, including a mix of home schooling, inclusion, and substantially separate instruction. The parties do not dispute I.M.'s eligibility for special education and related services.

13.     On January 13, 2011, defendant NPS filed with defendant BSEA requesting a hearing under the IDEA. *BSEA Op.* at p.1.

14.     The following events pre-dated Northampton's request for a hearing:

   a. In August 16, 2010, Parents signed consent to placement at the Perkins School for the Blind ("Perkins"). Parents indicated that they accepted placement at Perkins but did not accept the denial of transportation. *BSEA Op.* at 2, ¶ 2.
   b. As of August 16, 2010, the IEP Team had not yet drafted the IEP. Thus, Parents agreed to the placement but did not (because they could not) provide informed consent for the program recommended by Perkins.
   c. I.M. began attending Perkins on September 8, 2010. *BSEA Op.* at 3, ¶ 4.
   d. The Hearing Officer found: "When a new student comes to Perkins, the staff accepts the IEP from the district and works on those goals and objectives with the student and seeks to establish a baseline based on their own observation of his or her skills and abilities and the staff begins to write their own IEP." *BSEA Op.* at 3, ¶ 6.
   e. During the time that I.M. attended Perkins, the school did not use his augmentative communication device in the residential portion of the program (the "Cottages") or the classrooms. *BSEA Op.* at 8, ¶ 21.
   f. Perkins could not have been working on the goals and objectives of the District IEP because those goals and objectives required use of I.M.'s augmentative communication device and laptop computer, which Perkins was not using.
   g. Parents' concerns about the Perkins' IEP, proposed in November, 2010

included, *inter alia*: (1) the use of a "step-by-step switch" with already recorded material was regressing in the area of communication; (2) I.M. could not use his communication device in the social skills group; (3) the literacy goal in the Perkins IEP included asking I.M. yes/no questions and he is capable of answering more complex questions; (4) Perkins significantly reduced I.M.'s services; (5) the communication goals included partner assisted communication and did not allow I.M. to be independent. *BSEA Op.* at 12 ¶ 28.

15. On December 29, 2010, Parents wrote to Northampton's Director of Special Education and informed him that they would not return I.M. to Perkins.

16. On January 4, 2011, Parents partially rejected the IEP proposed on November 22, 2010. They accepted the 32.5 hours of services but did not accept the allocation of services. The requested increased speech and language supports and communication services. Parents did not agree to delivery of services in Grid C, in a substantially separate entity.

17. On January 13, 2011, NPS requested a hearing and sought resolution of the following question: "Whether the IEP proposed by the Northampton Public schools from the time period from November 22, 2010 to November 21, 2011 was reasonably calculated to provide Student with a free appropriate public education in the least restrictive environment?" *BSEA Op.* at 2, Issue 1.

18. Parents asserted a counter-claim, asking "whether the Holyoke program proposed by Parents, under the direction of Hilary Jellison, will provide Student with a free appropriate public education in the least restrictive environment?" *BSEA Op.* at 2, Issue 2.

19. From March, 2009 through the present, NPS has failed to take appropriate steps to ensure that Isaiah's ability to communicate was as effective as other students:

    a. In October, 2007, NPS funded an Augmentative Communication Evaluation completed by a consultant to NPS. This evaluation noted that, as a result of dysarthria, I.M. exhibited severely unintelligible speech. The prognosis for improvement of his speech was guarded; his connected speech was not (and probably would never be due to dysarthria) intelligible for functional communication. That evaluation recommended a speech-generating device ("SGD") called the ECO-14. Although the evaluation was available in November 2007, Northampton did not share it with the IEP team members.

    b. From March, 2009 through March, 2010 (when Parents removed him from the public elementary school), to the extent he was allowed to participate in the general education classroom, I.M. had no means of communication, because he did not have his SGD or his computer.

    c. As of August 11, 2010, I.M. was able to use an ECO-14 with 45 buttons per page that he accessed through two head switches. This was a phrase-

based overlay that I.M. used with two-step scanning. At that time, I.M. was using the device to communicate questions, respond, comment and share information with peers and adults, throughout the day in 1:1 setting and within groups. Rather than allow I.M. to continue to communicate as he had previously, Perkins personnel switched to less effective "low tech" methodologies. *BSEA Op.* at 7, ¶ 18.

## CAUSES OF ACTION/STATEMENT OF CLAIMS
### COUNT I
### AMERICANS WITH DISABILITIES ACT, 42 U.S.C. § 12131

20.    Plaintiffs repeat the allegations in paragraphs 1 – 19 and incorporate them herein fully by reference.

21.    NPS is subject to the non-discrimination provisions of the ADA applicable to provider of local government services.

22.    With respect to communication needs, the ADA regulations in effect through March, 2011[2] provided as follows:

> (a) A public entity shall take appropriate steps to ensure that communications with applicants, participants, and members of the public with disabilities are as effective as communications with others.

> (b)(1) A public entity shall furnish appropriate auxiliary aids and services where necessary to afford an individual with a disability an equal opportunity to participate in, and enjoy the benefits of, a service, program, or activity conducted by a public entity.

> (2) In determining what type of auxiliary aid and service is necessary, a public entity shall give primary consideration to the requests of the individual with disabilities.

23.    In March, 2009, NPS, without parental consent and over parental objection, significantly altered I.M.'s speech and language services. No evaluative date supported the changes Northampton implemented. It became apparent that NPS was not implementing the crucial recommendations related to auxiliary aids and services that would allow I.M. to communicate effectively and within natural contexts with his peers within Northampton's program.

24.    From March, 2009 through March, 2010, NPS intentionally discriminated against I.M. when it failed to provide him with appropriate auxiliary aids and services

---

[2] On March, 2011, 28 C.F.R. 35.160 was amended to provide more detail as to the requirements.

necessary to afford I.M. the ability to participate in, and enjoy the benefits of, Northampton's services, programs and/or activities in an equally effective and equally integrated manner as his peers.

25.     From August through December, 2010, NPS intentionally discriminated against I.M. by refusing parental requests for a team meeting to discuss assistive technology and augmentative communication devices.

26.     From September through December, 2010, NPS intentionally discriminated against I.M. by contracting with a private school that deprived I.M. of a communication system previously proven effective for him. NPS failed to take appropriate steps to ensure that I.M. would be able to communicate effectively and within natural contexts and failed to give primary consideration to the requests of I.M.'s parents related to the use of his communication device.

27.     Northampton's actions violated the non-discrimination provisions of the ADA and, in particular, 28 C.F.R. 35.160.

28.     As a direct and proximate result of Northampton's intentional violations of the ADA, plaintiffs suffered and continue to suffer severe emotional distress accompanied by physical manifestations thereof and other ongoing mental, physical and emotional harm.


### COUNT II

### INDIVIDUALS WITH DISABILITIES EDUCATION ACT, 20 U.S.C. § 1400, *et seq.* and M.G.L. C. 71B REHABILITATION ACT, 29 U.S.C. § 794

29.     Plaintiffs repeat the allegations in paragraphs 1 – 28 and incorporate them herein fully by reference.

30.     The Hearing Officer committed an error of law in exercising jurisdiction over Northampton's request that the BSEA issue a declaratory judgment upholding the validity of the November 22, 2010 IEP written by Perkins because:

    a.   IDEA provides that a party may present a complaint with respect to any matter relating to the identification, evaluation, or educational placement of a child "***which sets forth an alleged violation***" of IDEA. 20 U.S.C. § 1415(b)(6) (emphasis added).

    b.   A school district's request for a declaratory judgment that it has proposed an appropriate program does not allege a violation cognizable under 20 U.S.C. § 1415. *Alief Indep. Sch. Dist. v. C.C.*, 2010 U.S. Dist. Lexis 34202, at *16 (S.D. Tex. Apr. 7, 2010).

31.     In light of the fact that the BSEA had no jurisdiction of Northampton's original Complaint, and the parties cannot confer jurisdiction upon the agency in the absence of statutory authority, its ruling is null and void.

## COUNT III (in the alternative to Count II)

### INDIVIDUALS WITH DISABILITIES EDUCATION ACT, 20 U.S.C. § 1400, *et seq.* and M.G.L. C. 71B REHABILITATION ACT, 29 U.S.C. § 794

32.     Plaintiffs repeat the allegations in paragraphs 1 – 31 and incorporate them herein fully by reference.

33.     In the event that the Court determines that the BSEA appropriately exercised jurisdiction over Northampton's request for a declaratory judgment that it had proposed an appropriate program, the Hearing Officer's conclusion that the November, 2010 IEP was appropriate is predicated upon legal error for, *inter alia*, the following reasons:

   a.   The Hearing Officer conceded that the Perkins IEP service delivery grid looks "different from IEPs from public school programs." The Hearing Officer concludes that because Perkins is a specialized school with an "extremely integrated" program, it need not delineate the types and amount of services in the IEP document as would a public school. *BSEA Op.* at 4, ¶ 10. However, this conclusion lacks legal support and seriously undermines the parental participation deemed so important in *Winkelman, supra*. The conceded failure to delineate services specifically in the IEP is a procedural violation that both compromised I.M.'s right to a FAPE and seriously hampered the Parents' opportunity to participate in the formulation process. This establishes an actionable IDEA violation. *See E.D. v. Newburyport Pub. Sch.*, 2011 U.S. App. Lexis 17240, at *7 (1st Cir. Aug. 19, 2011).
   b.   The evidentiary record does not support the Hearing Officer's conclusion that the goals and objectives in the Perkins IEP and the pendent IEP were similar. *BSEA Op.* at 3, ¶ 6. Instead, a comparison of the two documents reveals that Parents were correct when they argued that the goals represented a retreat from progress I.M. made previously.
   c.   The failure to provide I.M. with any effective communication system was a deprivation of FAPE.
   d.   The Hearing Officer erred as a matter of law when she concluded that the IEP represented a free and appropriate public education in the least restrictive environment but also indicated that it might be able to be implemented in a school closer to home. *BSEA Op.* at 17. Given her conclusion that I.M. can receive an appropriate program while living at home, Perkins, a residential, segregated setting, is not the least restrictive environment.
   e.   The BSEA Hearing Officer erred as a matter of law when she concluded that, despite failing to convene a Team meeting from March 2009

through November 22, 2010, failing to implement accepted portions of the November 2010 IEP, failing to convene a Team to consider the ICCD Neuropsychological Report and AT Assessment of July 2009, the ICCD Report of School Observations of January 2010, the Functional Behavioral Assessment of February 2010, and the 2010 AAC Summer Camp Progress Report, failed to plan for I.M.'s transition to Perkins, refused to discuss I.M.'s transportation to Perkins, failed to provide I.M.'s parents with meaningful access to the Team, and failed to monitor I.M.'s placement at Perkins, NPS did not violate the procedural protections under the IDEA when the failures and refusals by NPS compromised I.M.'s right to FAPE and caused a deprivation of educational benefit.

34.    The BSEA Hearing Officer acted arbitrarily and capriciously as follows:

   a. The Hearing Officer found that the November, 2010 IEP Team had all necessary members in spite of the fact that NPS convened the team without anyone who specializes in augmentative communication and assistive technology.
   b. The Hearing Officer failed to recognize that Parents had a right to rely upon the IEP as written. The IEP as written included a drastic reduction in services with no explanation for that reduction.
   c. The Hearing Officer's finding that the November, 2010 IEP was similar to the previous IEP lacked any basis in the evidence presented at the hearing.
   d. The Hearing Officer ignored the fact that the November, 2010 IEP was not aligned with evaluation data or with recommendations in the most current evaluations.
   e. The Hearing Officer found the November, 2010 IEP appropriate in spite of the fact that it was written for a 5-day-per-week day program although I.M. was forced to attend the NPS's recommended 7-day-per-week residential program at Perkins.

35.    The failure to provide an appropriate educational program violates both the Rehabilitation Act and the Individuals with Disabilities Education Act.

### Prayer for Relief

WHEREFORE, the Plaintiffs respectfully pray that the Court:

A.    Assume jurisdiction over this action;

B.    Receive the records of the administrative proceedings and hear additional evidence as necessary to make an accurate, independent decision on the merits;

C.    Hear evidence related to Plaintiffs' claims in Count I of the Complaint and award compensatory damages;

D.    Declare that the BSEA Hearing Officer lacked jurisdiction over Northampton's request for a due process and its ruling was therefore null

and void or, in the alternative that the Hearing Officer committed a legal error in holding that the November 22, 2010 IEP was appropriate and reverse that ruling;

E.  Order payment of reasonable attorney's fees and costs pursuant to IDEA, Section 504 and the ADA and expert witness fees pursuant to Section 504;

F.  Grant the Plaintiffs compensation for damages suffered; and

G.  Grant such other relief as the Court deems just and equitable.

The Plaintiffs demand a jury trial in this matter.

Respectfully submitted,

I.M., by and through his Parents and next friends

Dated August 30, 2011

/s/ Peter L. Smith

200 North Main Street, Suite 8
East Longmeadow, MA 01028
413.525.1136
413.524.4128 (fax)
BBO# 542544

Of Counsel:

REISMAN CAROLLA GRAN LLP
Catherine Merino Reisman
19 Chestnut Street
Haddonfield, NJ 08033
856.354.0071
856.873.5640 (fax)