**COMMONWEALTH OF MASSACHUSETTS**
**DIVISION OF ADMINISTRATIVE LAW APPEALS**
**SPECIAL EDUCATION APPEALS**

Northampton Public Schools v. Student                BSEA #11-4229

**DECISION**

This decision is issued pursuant to M.G.L. c. 71B and 30A, 20 U.S.C. § 1401 et seq., 29 U.S.C. § 794, and the regulations promulgated under said statutes.

A hearing was held on March 14, March 17, and April 12, 2011 at the Office of Catuogno Court Reporting before Catherine M. Putney-Yaceshyn, Hearing Officer.

**PROCEDURAL HISTORY**

Northampton Public Schools requested a hearing on January 13, 2011 and the hearing was scheduled to proceed on February 2, 2011. Northampton's unopposed request to postpone the hearing was allowed and the hearing was rescheduled to proceed on March 14 and 17. The hearing was held on March 14, 17, and April 12, at the office of Catuogno Court Reporting, Worcester, Massachusetts. The Parties requested a postponement to submit written closing briefs and the hearing officer set a deadline of May 2, 2011 for their submission. This deadline was extended until May 6, 2011 at the Parties' request. Northampton submitted its closing brief on May 6, 2011. Parents submitted their closing brief on May 9, 2011. Northampton did not object to the Parents' closing brief being submitted on May 9, 2011 and the record closed on that date.

Those present for all or part of the Hearing were:

| | |
|---|---|
| Mother | |
| Father | |
| Margaret Slitzky | Parents' advocate |
| Peter Smith | Attorney for Parents |
| William Robert Hair | Education Director, Perkins School for the Blind |
| Kathryn Mahony | Inclusion specialist, Northampton Public Schools |
| Nathan Ziegler | Director of Special Education, Northampton Public Schools |
| Hillary Jellison | Speech language pathologist/Parent consultant |
| Kathy Rielly | Parents' independent evaluator |
| Sandra Donah | Supervisor of Special Education, Northampton Public Schools |
| Alisia St. Florian | Attorney, Northampton Public Schools |
| Catherine Putney-Yaceshyn | Hearing Officer |

Exhibit 1
page 1 of 17

The official record of this hearing consists of joint exhibits marked J-1 through J-52 and approximately 17 hours of recorded oral testimony.

**ISSUES**

1. Whether the IEP proposed by the Northampton Public Schools for the time period from November 22, 2010 to November 21, 2011 was reasonably calculated to provide Student with a free appropriate public education in the least restrictive environment.

2. If not, whether the Holyoke program proposed by Parents, under the direction of Hillary Jellison, will provide Student with a free appropriate public education in the least restrictive environment.

**SUMMARY OF THE EVIDENCE**

1. The student (hereinafter, "Student") is ten years old, resides in Northampton, and most recently attended the Perkins School for the Blind (hereinafter, "Perkins") in Watertown, Massachusetts. He has been diagnosed with dystonic quadriplegic cerebral palsy in the severe range, cortical visual impairment, and apraxia of speech. He is non-ambulatory and uses a wheelchair for transportation at school. He communicates through vocalizations, an ECO augmentative communication device, a communication notebook, Mayer-Johnson picture symbols and a Little Step-by-Step switch. Student is described as "charming" and well liked by his peers and staff alike. (J-28, Mother)

2. Student was accepted as a Student at Perkins on or about April 27, 2010 after Parents requested a referral. (J-15, Mother) The Parties agreed that an IEP for Perkins would be developed after Student began attending. (J-17, Ziegler) Northampton hoped an IEP drafted by a third party, Perkins, instead of the district would make the IEP more acceptable to Parents than the recent Northampton IEPs had been. (Ziegler) Parents signed the Placement Consent Form specifying a residential school (Perkins) on August 16, 2010. There is a notation that Parents were requesting a meeting "to discuss denial of transport" and they were accepting placement only. This decision will not address the issue of transportation, because it was resolved by another hearing officer in a ruling dated November 30, 2010.[1] (J-28)

3. The Lower School at Perkins has sixty students of varying levels of disability. All have sight impairment and most have a secondary disability. Some students have severe cognitive and language disabilities or physical disabilities. There are sixteen classrooms with an average of four students per class. Students go out from their main classroom for related services, music and gym, and stay in the classroom for academics. The classes are thirty minutes in length and there are ten periods per day from 8:30 a.m. until 3:00 p.m. Not included in those periods is

---

[1] See *In Re: Khaled and Northampton Public Schools BSEA #07-2902.*

2

Exhibit 1
page 2 of 17

lunch.  Students have art, music therapy, and gym and most have social skills groups, and most have a snack time where they practice eating and social groups.  Students participate in a swimming program.  There are two nurses dedicated to the Lower School.  A teacher of the visually impaired was Student's main teacher.  There was a teacher's assistant, and Student had a dedicated one-to-one aide both in the classroom and the residence.  Student had a one-to-one because Perkins staff wanted to work on his physical therapy and occupational therapy skills.  His one-to-one aide also had a background in speech language pathology and was able to work on his speech and communication.  The residences are known as cottages.  Each cottage sets its own schedule which includes recreational activities and trips to libraries for story time or to a restaurant to practice ordering food and handling money.  Student's cottage had approximately six students. (Hair)

4. Student began attending Perkins on September 8, 2010. (Ziegler) Student attended most days in September, but was sometimes late. (Hair)  Student's attendance record shows that he was present for at least some portion of 48 of 70 possible days during his period of attendance at Perkins.  Those numbers do not include days on which he was tardy and missed a portion of his programming.  Student spent his first night at Perkins on September 30, 2010 and spent approximately 17 of a possible 53 nights at Perkins during the course of his attendance  (J-52) During November Student was absent eleven times of a possible 19 days.  In December he was absent 8 times of a possible thirteen days.  Northampton never received a note from a doctor indicating that Student required a bed other than the beds Perkins already had. (Ziegler)

5. Although Student was accepted as a residential Student, Parents initially transported Student from Northampton to Perkins in Watertown, Massachusetts each day. (Mother, Hair) Northampton had understood that Student would attend Perkins as a residential Student because of its distance of approximately 100 miles from Student's home.  Perkins staff also assumed that he would be a residential student due to the distance that he lived form Perkins. (Hair)  Northampton did not become aware that Student was being driven to and from Perkins every day until the end of September. (Ziegler)

6. When a new student comes to Perkins, the staff accepts the IEP from the district and works on those goals and objectives with the student and seeks to establish a baseline based on their own observation of his or her skills and abilities and they staff begins to write their own IEP.  The Perkins IEP goals and objectives and the skills which they address are very similar to the IEP which Student had when he arrived. (Hair, J-28)

7. When Student first arrived the Perkins staff was looking at the best ways for Student to communicate.  They first took the pages from his ECO device (templates of vocabulary and words that are used in different settings) and translated that into a notebook that could be used in the day and residential environments while they set up the ECO system.  Mr. Hair recalls that the speech

3

Exhibit 1
page 3 of 17

language pathologists working with Student were not satisfied with the way Student's Eco was set up. They thought that they could make it easier for him to use and were going to redesign the pages so that Student would not have to go through so many choices to get to the word he wanted to say. There was one principle speech language pathologist who was the leader of his overall speech program. Two others worked with him as well. They felt Student's needs were so complex that they needed a team to work with him. One speech language pathologist was very knowledgeable about augmentative communication systems and the assistive devices that go along with them such as switches. A third speech language pathologist was to work on his eating skills and oral motor skills. (Hair)

8. Initially, Mr. Hair believed Student's transition to residential would occur for a short time and that Student would begin staying residentially more quickly than he did. Issues such as the appropriate type of bed kept coming up. Most students sleep in regular beds, but Perkins staff pulled a hospital bed out of storage because they thought it would be safer for Student. Once the parents raised the issue of the bed's safety, they made some modifications. He does not recall there being a physician letter indicating that the bed was not safe. (Hair)

9. The nights that Student stayed in the cottage were successful. There was some homesickness, but he seemed to enjoy being around the other students in the residence. Mary Talbot, the school psychologist, told him that Student enjoyed the interactions with other boys during his social skills group. (Hair)

10. The Perkins program is extremely integrated. This results in the services delivery grid looking different from IEPs from public school programs. This is because all of the staff from the teaching assistants to the school psychologists to the teachers are well-versed in how to implement speech, communication, and physical therapy strategies. There does not need to be so much consultation because of the experience of the staff in working in different modalities. There is also a very low staff to student ratio which gives them a large amount of time to meet with parents, work on strategies, to make adaptive devices or communication pictures and symbols. There are a lot more services provided in the specialized program at Perkins, according to Mr. Hair, and there are things they can do that public districts cannot do. He does not agree with Mother's opinion that the Perkins IEP represents a reduction in services from Student's prior IEP. Mr. Hair explained that the Perkins program is more geared toward a student with visual impairments and with multiple disabilities and it provides more services to a student than a public school program. (Hair)

11. The Perkins staff, as a team, believed they needed more time with Student. They wanted to work with him more consistently. Because Parents were trying to provide daily transportation, Student was sometimes coming in late and missing days. Perkins was not able to fully develop his program because according to Perkins staff it takes a long time to get to know a student with needs as complex as Student. Sometimes it takes a year to really develop a program. Student was not

able to make as much progress as the staff would have liked given the time Student missed. They tried to ensure that the Cottage was a safe environment and that they had communication symbols in place. (Hair)

12. Peg Beck e-mailed Mother on September 23, 2010, stating that Perkins would be ready for Student to sleep over the following Thursday (September 20, 2010.) Mr. Hair called Mr. Ziegler to tell him that they were still transitioning Student to residential. (J-43, pg. 4; Hair) Mr. Hair believed they were ready for Student to attend school by September. He stated there was a residential staffing issue that could have been resolved by the use of a substitute staff member. He was not made aware of the issues regarding the toilet seat and shower raised by Parents. Peg Beck is a social worker who had a large role in Student's transition. Mr. Hair did not know what equipment she was referring to. (Hair)

13. Mr. Hair explained that communication is the primary concern for Student because he cannot speak. When the staff began working with Student they were putting templates of vocabulary on each page of Student's Eco in a notebook that could be used in the day and residential program. The speech language pathologists were going to redesign the pages to make it easier for Student to get to the word he wanted on his Eco. One speech language pathologist was primarily responsible for Student while two others worked with him. They used a team approach. One had experience with augmentative communication and one wanted to work on Student's eating skills. Mother was very helpful to the Perkins staff. She demonstrated the communication device and communicated her goals and wishes. She provided staff with a copy of the neuropsychological assessment and assistive technology evaluation report completed in July 2009 (J-38) and the Report of School Observation completed between September 2009 and January 2010 (J-38). Mr. Hair described Mother as extraordinarily helpful. Mr. Hair explained that a consult of 1 x 30 minutes per week in the area of assistive technology/AAC was appropriate in the Perkins setting because the staff has a great deal of experience in both high tech and low tech communication. Many staff members already know how to work with students like Student. If Student had remained at Perkins, the IEP would have continued to be modified. (Hair)

14. Mr. Hair explained that appropriate peers for Student include both peers who are able to communicate without technology and those who use devices. He did not know whether Student was able to read independently at grade level or whether his listening comprehension was at grade level. However, he explained that Perkins would monitor and assess Student's learning because it takes time to find the baseline for a new student. (Hair)

15. The Team convened to develop an IEP for Student on November 22, 2011. The IEP describes Student's program and states that he participates in group language, science and social studies lessons. It describes Student as an auditory learner and states that he listens to literature and answers yes/no comprehension questions. It also states that Student enjoys sharing information he has learned in other

classrooms through the use of a pre-recorded Step-by-Step voice output switch. The IEP describes the behavioral consultation provided by the school psychologist and references his Behavior Support Plan. The IEP reflects the fact that Student occasionally becomes upset as expressed by crying or agitation and that he responds to strategies such as going for a calming walk or taking a deep breath. The IEP describes Student's speech services as occurring twice per week, once individually and once in the classroom for implementation of his communication program. The IEP describes Student's use of a total communication approach "including words, word approximations, vocalizations, augmentative communication devices with voice output, gestures and picture communication symbols. The IEP states that Student and his therapist are still getting to know one another because Student had only attended three of his scheduled individual sessions to date. The IEP references Student's ECO communication device and states that it has not been in use at school "due to a combination of factors related to his absence from speech classes, as well as overall absences from school." Additionally, it states that during trials with the ECO Student was quick to cry and become upset when he did not succeed in communicating his intended message. The staff had been using a picture symbol communication book based on his ECO pages. It stated that Student had been using single switches and multiple message switches with voice output to interact with peers and staff. (J-28)

The IEP contains a great number of accommodations including "augmentative communication devices", communication device (e.g., low-tech, high-tech, book, board.) The IEP describes the way that content will be modified for Student. It states that "The curriculum will be modified to meet his needs and presented at his instructional level." His instruction is to be designed to take advantage of his strong receptive language while assisting him in developing his expressive language. (J-28)

The IEP contains goals and objectives in the following areas: Functional Academics/Mathematics; Communication; Social; ADL; Motor Skills; Orientation and Mobility; Functional Academics/English Language Arts; Fine Motor. The Service Delivery Grid contains the following. Technology consult with a teacher 1 x 30 minutes per month; social work consultation with the social worker 1 x 30 minutes per month; speech language pathology with the speech language pathologist 1 x 30 minutes per month; Assistive Technology/AAC with the speech language pathologist 1 x 30 minutes per month; psycho-educational/Developmental consultation with the school psychologist 4 x 30 minutes per month; occupational therapy with the occupational therapist 2 x 30 minutes per month; physical therapy with the physical therapist 2 x 30 minutes per month and orientation and mobility with the orientation and mobility specialist 1 x 30 minutes per month. There are no services in the B grid. The C grid contains the following services. Academics provided by a teacher 34 x 30 minutes weekly; speech language pathology 2 x 30 minutes weekly; social play skills group provided by the school psychologist 1 x 30 minutes weekly; music therapy provided by the music therapist 2 x 30 minutes weekly; "general program"

provided by "Perkins Staff" 15 x 30 minutes weekly; occupational therapy provided by the occupational therapist 2 x 30 minutes per week; physical therapy provided by the physical therapist 2 x 30 minutes per week; and Orientation and Mobility provided by he Orientation and Mobility Specialist 2 x 30 minutes per week.

The nonparticipation justification portion of the IEP states that because of the complex nature of Student's intellectual and visual disability, education in regular education classes with the use of supplementary aids and services cannot be achieved satisfactorily. The IEP also states that Student requires a longer school year to maintain skills and prevent regression in all domains "June 27 through July 29, 2011." The Additional Information section of the IEP states that Student will participate in the following activities as an additional component to his program at Perkins: adapted physical education 2 x 30; art class 1 x 30; Large Group Music therapy class 1 x 30; and swimming 1 x 30. (J-28)

16. Parents did not raise any concerns about Perkins and did not seek to change any portion of the IEP at the Team meeting. (Ziegler) They rejected portions of the IEP on January 4, 2011. They accepted the 32.5 hours of services, but did not accept the way in which the hours are allocated. They wanted speech language supports to be increased. They recommended removing Orientation and Mobility and music therapy in order to augments speech language communication services. They rejected the rest of the IEP. Additionally, they rejected the substantially separate setting and the delivery of all services in Grid C. (J-28, Mother)

17. In early November or late October, Mr. Ziegler received an e-mail stating that the Team believed Student would benefit more from more regular attendance. (Ziegler) Additionally, Perkins raised concerns about Student's access to speech and language services because of his arriving late at school. (Ziegler) Transportation was negatively effecting Student's placement. (Hair) Neither Mr. Ziegler nor Mr. Hair was aware that Student did not have an adapted toilet seat or shower chair until the end of September and Northampton could have provided such equipment if it had been notified. (Ziegler, Hair) Students with profiles similar to Student have been able to use the showers and beds at Perkins. (Hair)

18. Staff was working on getting Student's Eco up and running. It was not used in the classroom or Cottage. His switches were not mounted and used in the classroom or Cottage. (Hair) Staff likes to use "low tech" methodologies in the beginning. They were working on modifying the screens and pages on his communication device because what he had was not the best for him. They were also working on his switches. (Hair)

19. Mr. Hair's supervisors thought that because of the litigation and the transportation causing a problem for Student attending school, they would offer some transportation until the end of the school year as a way to get him back to school. Mr. Ziegler did not object as long as it was done privately between Parents and

Perkins. The transportation was to pick up Student on Fridays and bring him home and to return him to Perkins on Monday. He made the offer to Parents some time around February 14, 2011. Mother called Mr. Hair the following week and said they were declining the offer because they were considering other options and were concerned about the distance to Perkins. They were not comfortable having Student remain at school from Monday to Friday. (Hair)

20. There are students with similar physical profiles to Student's at Perkins who have been able to use the shower equipment at Perkins and the beds successfully. (Hair)

21. Mr. Hair did not know whether the ECO was ever used in the classroom between September and December. He was not aware of it being used in the Cottage during the aforementioned period. Neither Student's laptop nor his switches were used in the classroom during that time. Mr. Hair explained that the Eco was being worked on. Also, the staff sometimes likes to start with low tech equipment before moving on to higher tech options. Additionally, the staff did not feel that Student's switches were positioned optimally for him. They were working on making adjustments with the goal of making Student's communication as effortless as possible. (Hair)

22. Kathleen Rielly is certified in moderate special needs and general education. She has an M.Ed. in Creative Arts and Learning and an Ed.S. in Assistive Technology. She has approximately twenty five years of experience as a special education teacher and general educator. She has worked as a technology curriculum specialist in an elementary school supporting special needs teachers integrating technology into the curriculum. She has worked in special education and regular education classrooms. Ms. Rielly is employed by the Integrated Center for Child Development (ICCD). She came to know Student through an evaluation done by the ICCD. Parents came to ICCD seeking a neuropsychological evaluation to obtain an estimate of Student's current level of functioning and receive recommendations around appropriate management and educational planning. (Rielly, J-37) The evaluation was conducted by Rafael Castro, Ph.D.

Ms. Rielly did not administer the neuropsychological testing, but she prepared and adapted the materials wrote a portion of the evaluation report and was in the room during the testing. She explained that she scanned the WISC IV materials and he responded to all questions in a multiple choice format using a two switch step scanning system with auditory previews. Student used his head to select the right switch for scanning through options and the left switch to select his desired response. (J-37) Ms. Rielly did not talk to anyone at Northampton before writing the report and she had not observed Student in class before writing the report. Any portions of the WISC that were not physically or visually accessible to Student were not done. Ms. Rielly stated that it is difficult to assess Student's cognitive abilities.

The report concluded that there was a clear disparity in Student's performance between verbal auditory and visual, nonauditory tasks. When presented with verbal tasks in which the question and answers were read to him, his performance was within the average range or above. When presented with solely visual material, Student was not able answer accurately. Dr. Castro concluded from the testing and Student's history that he has average or above verbal cognitive skills and good ability to hold information in memory for a period of time. Student's receptive language is approximately at age expectation. However his expressive language skills fall at an early three-year level. Student's skill in listening to short stories and answering questions about them was low average for his age.

Dr. Castro made a number of recommendations for Student. First, he recommended that Student receive specialized instruction for half of his school day. He recommended that the rest of the day be devoted to group-based instruction, including specials, reading, science, social studies, and other topics. He recommended that he receive grade-level instruction and that he be provided social participation. He recommended careful attention to scheduling of therapies in order to prioritize regular, planned access to inclusion in whole class activities. He recommended that Student have a dedicated space within the general education classroom and uninterrupted access to a laptop computer with appropriate switches and mounts. He recommended a full time, dedicated 1:1 aide to support Student's physical, self-care, sensory, communication, and assistive technology needs. He recommended content area inclusion and opportunities for social interaction. He made a number of recommendations in the area of literacy including systematic, direct instruction in letter-sound associations, recognition of high frequency sight words, recognition of personally meaningful sight words, guided reading instruction with appropriate level texts, independent reading exposure, and direct instruction and supported practice in written language. He recommended intensive speech language services at the highest frequency possible with an emphasis on improving his expressive output using assistive technology. (J-37)

23. Ms. Rielly testified that Student's above average cognitive skills means that he can be presented with age appropriate material and can understand it and demonstrate his understanding. She stated that it is crucial to increase Student's access to peers and to technology that would increase his access. She recommended that Student's literacy skills be prioritized. She believes he requires a systematic approach to phonics to increase his access to communication. She explained that the ECO has a word prediction feature that Student could utilize. Increased knowledge of phonics would give him an increased opportunity to access more of the words in his mind. She also believes he requires explicit teaching regarding his communication device, the ECO. She stated that the ECO should be used everywhere, not just in the specialized classroom. She stated that his laptop is just as important as the ECO because it is a way for him to access the curriculum. He is able to use his laptop with two step switches. (Rielly)

Ms. Rielly testified that she worked with Student individually in April and May 2010. She provided him with 1:1 tutoring on four or five occasions. She worked on lessons involving a book by one of Student's preferred authors per Parent report. Ms. Rielly testified that she scanned the book in Kurzweil and Student would click through the story and ask questions. Student was able to make personal connections and identify the feelings of the characters. She used a whiteboard to give Student choices. Student exhibited some behaviors such as whining during the lessons, but Ms. Rielly was able to redirect him. She developed a communication book to use with Student during her lesson because she found that she required something more than his ECO. Ms. Rielly is not familiar with the Perkins program and has not observed Student there. (Rielly)

24. Ms. Rielly also participated in the school observation which took place between September 28, 2009 and January 5, 2010. The observation yielded a fifty six page report containing at least one hundred and twenty three detailed recommendations. The recommendations were summarized as follows. 1) Vision: one that respects [Student]'s capacity for learning; 2) Inclusion: modified co-teaching model, inclusive instruction-literacy, content areas; 3) collaboration and communication: regular meetings, dynamic integration of services; 4) special services and therapies: wholly integrated into functional settings; staffing: active recruitment of skilled, experienced, passionate individuals; 5) roles and responsibilities: clearly defined, expanded, supervised; 6) diagnostic teaching: a perspective to guide the work of all professionals; 7) communication initiative: priority, ECO-restructured, low tech supports, pragmatics; 8) literacy: 1:1 specialized instructional program of phonics for decoding and encoding and inclusive reading program targeting comprehension strategies; 9) recreation: creative programming to provide regular, meaningful play with peers; 10) assistive technology: commitment-resources, training, programming, materials prep. (J-38)

25. Hillary Jellison has an M.Ed. in speech language pathology. She worked at Holyoke Medical Center for 7.5 years conducting evaluations, providing individual and group therapy, and consulting to schools. Eighty percent of her caseload consisted of people who used augmentative and alternative communication (AAC) devices. She is licensed in the state of Massachusetts and ASHA certified. Ms. Jellison began working with Student approximately two years ago when he came to her for an evaluation. She has worked with him individually in his home and in social groups at the JCC social group and AAC camp.

Student attended the 2009 and 2010 AAC summer camps which Northampton funded. The focus of the camp was on communication and training students' paraprofessionals. In 2010 Student tolerated the noisy environment and tolerated the use of the ECO for longer than her had in 2009. In 2010 he was joining into conversations with peers using the ECO. His use of the ECO was more efficient than it previously had been. He was using it to ask questions and respond and make comments. Ms. Jellison made some recommendations for Student's programming. She testified that he needs a staff person with experience in AAC.

She runs an after school social group in which Student has participated. It consists of three to six students with communication devices between the ages of four and twelve of varying cognitive activities. The focus is on social communication and music therapy. Student has also participated in Ms. Jellison's vacation camp at the JCC during February vacation which focused on social communication. Student did not have one to one aide, but Mother came to assist with activities of daily living. Student was able to use his ECO with little prompting and moderate prompting when a new task was introduced. He did not whine or cry much and he was able to request a song with his device during music therapy.

Ms. Jellison has a contract with the Holyoke Public Schools to provide consult regarding AAC. She is familiar with a "program" at the E.N. White School in Holyoke through discussions with her business partner, Nerissa Hall and the special education director in Holyoke. There are two students in the program to which Ms. Hall provides consultation. Both students are younger than Student and one has a similar profile to Student. Ms. Jellison and Ms. Hall have proposed setting up an AAC classroom in September 2011. The program does not currently exist and may or may not exist in September. The proposal would be to provide students with access to a regular education classroom, occupational therapy, physical therapy, speech language therapy, and an "ACC resource room. In September Ms. Jellison or Ms. Hall would run an "AAC classroom" where students would spend one to two hours per day. Student would be in an inclusion classroom for the rest of the day. There would be a paraprofessional in class and there could be two other students in the classroom. Student's ECO would be mounted and available to him at all times. Ms. Jellison has provided training at the E.N. White School on devices such as the ECO, Board maker, and other AAC devices. The speech language pathologist, Kim Kissell has consulted with her and is familiar with programming and using communication devices. The 2010 AAC campo was at the E.N. White School and the administration at Holyoke Public Schools has been open to assistive technology and AAC.

Ms. Jellison explained that use of Student's device can allow him to protest a task before he has a tantrum. It would give him more control over his environment. She has seen Student use the device to communicate with peers. He likes to share jokes. (Jellison)

26. Ms. Jellison has never worked with Student in a school letting. She agrees that it takes time to develop a program for a student like Student. The program will be set up if Student attends. The set up of the program and training of staff would have to happen before Student began attending. Ms. Jellison is not an inclusion specialist and has never observed Student in an inclusion setting. (Jellison) )

27. Mother testified at length regarding Student's needs and the equipment necessary to meet his needs. She explained that his cerebral palsy affects him in all domains and he requires facilitation by another person in most activities. She explained that he requires a medically scripted bed for safety because he has abnormal posture

and dystonia and his is tiny and could get caught in the slat of a hospital bed. She described the importance of seating and positioning Student to reduce orthopedic issues. She explained that Student has a partial head rest which helps him with orientation and is utilized to allow Student to use his switches. The switches enable him to operate his computer or ECO or to access you tube on the television, which he loves. The switches allow him to make choices independently and he is very skilled at using them. Student uses his laptop to access programs such as Intellitools and to read National Geographic Magazine. Student loves music and has an I-pod which he brings everywhere with him. Along with his family, Student has participated in swim programs, adaptive recreational skiing, and bowling. He goes to the JCC, YMCA, movies, library, restaurants, grocery store, and Apple Store. He has been to a number of museums and has seen the Boston Pops. He goes to the park weekly. He has been roller skating and ice skating. Student and his almost five year old sister have a very devoted relationship. She is very verbal and imaginative and gets in trouble often. Student enjoys laughing at her and they play games together.

28. Mother testified that Student's March 2009 IEP was accepted except for three areas. One rejected portion was the use of a power chair. The second was that she wanted an oral motor program added. The third rejected portion was that she wanted a regular education teacher consult in grid A. (J-29) With respect to the IEP proposed by Perkins, Mother was concerned by her opinion that Student's services were significantly reduced. She was concerned that Student was participating in a social skills group without using his communication device. She was concerned that the literacy goal on the Perkins IEP included asking Student yes/no questions and he is capable of answering more complex questions and expressing his feelings. She believed that the communication goals relied on partner assisted communication and did not allow Student to be independent with communication.

Mother understood Student's program would be a Monday through Friday program. She was told that it could be partial residential program and some students were there two nights per week depending on his or her needs.

Mother testified that Student's attendance at the AAC camp was one of the best educational experiences he had. He was able to have spontaneous interactions with peers and had confidence as a result of his achievement.

When Mother received the Perkin progress report dated November 2010 she was concerned because she thought using a "step-by-step switch" with already recorded material was regressing. She was concerned that there was no attention being paid to phonics skills. She was also concerned that Student was not able to use his communication device in the social skills group.

Mother first became aware of the Holyoke "program" through other parents from the AAC camp. She understood it to be a partial inclusion program with a focus on

computers and communication devices to allow access to the classroom with curriculum and a specialized language classroom for students who rely on speech generating devices.  Student would receive a grade level curriculum in Holyoke.  A goal of the program is for students to be able to use their devices in natural settings.  When Mother learned of the Holyoke program she thought it would solve two problems for the family.  It would allow Student to stay at home with his family in his community and it was a short drive from their home.  Also, the E.N. White School's students are in Kindergarten through grade eight, which obviate the need to transition to a middle school program.  Mother believes Student would be successful at the Holyoke program because he has worked with Ms. Jellison weekly beginning in February and his relationship with her is very productive.  He has a high level of engagement with her and a high level of motivation.  Student has shown independent use of the ECO with Hilary at the summer camp and at the JCC.  Mother believes that the Holyoke program is different from the program Northampton provided at the Leeds School because of its desire to include Student and because it provides Student the opportunity to go to the cafeteria and she has seen Ms. Jellison design ways for Student to participate to gym and other activities.  Mother has not visited the Holyoke program because it does not exist.  (Mother)

Mother testified that Student would have remained at Perkins if transportation home was provided to Student on weekends.

**FINDINGS AND CONCLUSIONS:**

Student is an individual with a disability, falling within the purview of the Individuals with Disabilities Education Act (IDEA)[2] and the state special education statute.[3]  As such, he is entitled to a free appropriate public education (FAPE).  Neither his status nor his entitlement is in dispute.  Under the FAPE standard, the IEP proposed by the school district must offer the student a free appropriate public education that meets state educational standards.  This education must be offered in the least restrictive environment appropriate to meet the student's individual needs[4].  Federal law also requires that the student be able to fully participate in the general curriculum to the maximum extent possible.  20 USC § 1415(d)(1)(A)(iii); 34 CFR 300.347(a)(2)(I) and (a)(3)(ii); 64 Fed. Reg. No. 48, page 12595, column 1; See also, In Re:  Worcester Public Schools, BSEA # 00-1912, 6 MSER 194 (2000).

As stated by the federal courts, the LEA is responsible to offer students meaningful access to an education through an IEP that provides "significant learning" and confers "meaningful benefit" to the student[5], through "personalized instruction with sufficient

---

[2] 20 USC 1400 *et seq*.
[3] MGL c. 71B.
[4] 20 USC 1412(5)(A)
[5]   For a discussion of FAPE see *Hendrick Hudson Bd. Of Education v. Rowley*, 458 U.S. 176, 188-189 (1992); *Cedar Rapids Community School District v. Garret F.,* 526 U.S. 66 (1999); Burlington v. Department of Educatio*n*, 736 F. 2d 773 (1st Cir. 1984).  *Houston Independent School District v. Bobby R.*, 200 F.3d 341 (5th Cir. 2000); *Stockton by Stockton v. Barbour County Bd. of Educ.,* 25 IDELR 1076 (4th Cir. 1997); *MC  v. Central Regional School District*, 81 F.3d 389 (3rd Cir. 1996), *cert. denied* 519 US 866

support services …"[6]. The requirements of the law assure the student access to a public education rather than an education that maximizes the student's individual potential. *Lenn v. Portland School Committee*, 998 F.2d 1083 (1st Cir. 1993); *GD v. Westmoreland School District*, 930 F.2d 942 (1st Cir. 1991).

The burden of persuasion in an administrative hearing challenging an IEP is placed upon the party seeking relief. *Schaffer v. Weast*, *546* U.S. 49, 126 S. Ct. 528, 534, 537 (2005). In this case, Northampton has the burden of persuading the hearing officer that the IEP for the period from November 22, 2010 through November 21, 2011 was reasonably calculated to provide Student with a free appropriate public education in the least restrictive environment. Similarly, Parents have the burden of showing that the IEP proposed by Northampton is not reasonably calculated to provide Student with a free appropriate public education in the least restrictive environment and that it cannot be modified to provide the same. Additionally, Parents have the burden of persuading the hearing officer that their proposal regarding the program contemplated by Hillary Jellison would provide Student with a free appropriate public education in the least restrictive environment.

Unfortunately for Student, and for all of the Parties in this matter, they have been involved in litigation during the course of several school years. This litigious posture has prevented them from resolving many areas of dispute (most recently, the transportation issue[7]) and was certainly a factor in Parents' decision to remove Student from the Perkins program. The litigation also played in a role in the Parties' ultimate decision to place Student in an out-of-district placement. Given the number of IEPs that had been rejected or partially rejected, Northampton hoped that having a third party (Perkins) write Student's IEP would result in an IEP that Parents would find acceptable. (Ziegler)

Mr. Hair was a credible witness regarding the Perkins program and the services that Perkins could provide to Student. He was knowledgeable about the Lower School program, its staffing, and Student's needs. I relied heavily upon him in making my conclusions. The Perkins IEP addressed all of Student's identified needs and provided for appropriate services to meet those needs. In fact, there was no evidence that Parents sought any services during the Team meeting that were refused by Perkins. Parents seemed to be satisfied with the IEP until the time at which they decided to stop bringing Student to Perkins. (See J-43, pg. 15, e-mail from Mother praising Perkins program; J-43, pg. 62, e-mail from Mother dated November 17, 2010 noting "very nice improvements" with Student's self-regulation; J-28, pg.65, stating that Behavior Plan looks viable and effective; J-43, pgs. 75 and 103 e-mail from Mother indicating that Student would not be coming to school that day and stating that their decision is "not

---

(1966); *Ridgewood Board of Education v. NE*, 30 IDELR 41 (3rd Cir. 1999). See also *GD v. Westmoreland School District*, 930 F.3d 942 (1st Cir. 1991).

[6] *Board of Education of Hendrick Hudson Central School District v. Rowley,* 458 U.S. 176, 203, 102 S.Ct. 3034, 3049 (1982).

[7] The evidence shows that each party refused an offer by Perkins to provide transportation to Student's home on weekends because they were awaiting a determination from the BSEA regarding transportation. Had the parties accepted the transportation offer, Student may have been able to continue in the Perkins program.

driven by dissatisfaction with the program." (J-43)  Parents made their decision to stop sending Student to Perkins after receiving the hearing officer's ruling denying their request for reimbursement of transportation expenses associated with their daily transportation of Student to Perkins (Watertown, Massachusetts) from Northampton, Massachusetts.  See In *Re:  Khaled and Northampton Public Schools* BSEA # 07-2902 (November 30, 2010)

The issues of whether Student required a residential placement for educational purposes and whether the Parties intended his placement to be a five-day or seven-day residential placement are a bit of a red herring in this matter.  The facts show that Northampton proposed a residential placement for Student at Perkins due to its distance from Northampton.  It is not particularly relevant to this dispute whether the Parties intended Student to be in a five-day or seven-day residential placement because Student rarely spent more than two nights per week at Perkins.  (J-52)  The issue of the appropriateness of the Northampton's transportation arrangement was addressed in BSEA #07-2902 and may not be revisited in this matter.  The evidence shows that despite the fact that Parents accepted a residential placement, they did not intend for Student to be a residential Student.  Parents wanted Student to live in their home with his family.  This is not meant as a criticism of Parents, as I found them to be extremely dedicated to Student.  However, the fact remains that Parents accepted a residential placement, yet even at the end of September when all of Parents' concerns about the residential portion of Student's program had been resolved, they continued to drive him back and forth between Northampton and Watertown most days.

It is not necessary to resolve the issue of whether in fact Perkins was ready for Student to begin attending residentially at the beginning of September.  Although there was conflicting testimony regarding this issue, the fact remains that Student continued to be transported on most days even after the Parties agreed that the Cottage was ready for Student's safely residing there.

Although Parents' witness, Ms. Reilly found the Perkins IEP to be lacking in several ways, she was not familiar with the Perkins program.  She had not observed Student in that setting and had not spoken to any of his service providers at Perkins.  Her testimony regarding the appropriateness of Perkins was not credible due to her lack of knowledge of the program.  I was not persuaded that an appropriate program for Student had to include all of the recommendations of the reports that she co-authored. (J-37, J-38)  In fact, the report marked as J-38 contained so many detailed recommendations that it would be virtually impossible for any school, public or private, to follow all of the recommendations or provide the staff necessary to follow the recommendations[8].  I am also not persuaded by her testimony that Student requires all grade-level instruction or an intense phonics program due to her lack of knowledge of Student's in-school functioning.

---

[8] I was not persuaded by Parents' assertion that this report was never considered by the Team.  The evidence shows that due to the ongoing litigation the Parties sometimes reviewed evaluations and recommendations during pre-hearing conferences and with the assistance of a BSEA hearing officer.  There is no persuasive evidence that Northampton ignored reports submitted by Parents.

15

Exhibit 1
page 15 of 17

These are areas that should be assessed by Student's service providers when his is placed in an educational setting.

Perkins staff noted Student's absences as having a negative impact on his progress. Perkins was not able to make revisions to Student's ECO which they deemed necessary, because Student missed all but three individual speech language sessions due to absences and tardiness. (Hair, J-23) Likewise, Student's switches were not set up for classroom use for the same reason. (Hair)

Because I have found that the Perkins IEP was reasonably calculated to provide Student with a free and appropriate pubic education in the least restrictive environment, I must also find that Northampton has fulfilled its obligation of proposing an IEP that is reasonably calculated to provide Student with a free appropriate public education in the least restrictive environment. However, Parents are unwilling to place Student there residentially, which has resulted in Student being out of school and without services for several months now. Parents wish for Student to live at home within his community and receive educational services there. However, neither Party has identified an appropriate placement that fulfils Parents' desired requirement of allowing Student to reside at home. Therefore, although Northampton has fulfilled its legal obligation to Student, the Parties are encouraged to attempt to locate a placement that can implement Student's appropriate IEP in a location which allows Student to continue to live with his family.

Although I am not required to address Parents' proposed program, having determined that Northampton's proposed IEP and placement were appropriate, I turn to Parents' proposal for Student's education. Parents seek Student's placement at the E.N. White School in Holyoke, in a program which currently does not exist and which may or may not exist next year. I am unable to find that this "program" is appropriate for Student. First of all, Parents did not provide a complete and detailed description of the program. The only information provided about the program came from Mother and Ms. Jellison. Mother's information came from conversations with Ms. Jellison and with parents of students who attended Holyoke Public School and received some services from Ms. Jellison and Ms. Hall. Ms. Jellison was unable to say for certain whether this program would even exist next year. Parents did not present testimony from any administrator from Holyoke who could verify plans to create a program which would fit Student's needs. There was no testimony from any of the inclusion teachers or therapists who would be involved in the proposed Holyoke program.

Furthermore, although Ms. Jellison has had some success in working with Student with his ECO and working with him in a one-to-one setting, she has never worked with him in a school setting. It is unclear whether she would be any more or less successful providing his services than any of the speech language pathologists who have worked with Student have been in the past. Based on the foregoing, I find that the proposed Holyoke program would not provide Student with a free appropriate public education in the least restrictive setting.

Although Northampton has fulfilled its obligation to Student, the fact remains that there is a young Student with significant special education needs who is currently not receiving educational services. The Parties are encouraged to explore local options which might allow Student to receive the services provided in the Perkins IEP while living at home. Parents and Northampton are encouraged to contact the Holyoke Public Schools to determine whether there will a program capable of implementing the Perkins IEP next year[9]. If there is to be a program, Northampton shall consider whether it could be appropriate to meet Student's needs. Because Student's Perkins IEP requires that Student receive extended school year services and Northampton has funded Student's placement at the AAC Camp for the past two summers, it should continue funding the program this summer.

**ORDER**

Based upon the foregoing, I find that the IEP written by Perkins Public School for the period from November 22, 2010 to November 21, 2011 is reasonably calculated to provide Student with a free appropriate public education in the least restrictive environment.

By the Hearing Officer,

_____
Catherine M. Putney-Yaceshyn
Dated:  June 3, 2011

---

[9] In addition, Parents should consider contacting the Holyoke Public Schools to determine whether Student could attend the E.N. White School, their preferred setting, as a "school-choice" student.